Filed 8/28/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| PEGASTAFF,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>PACIFIC GAS AND ELECTRIC<br>COMPANY, et al.<br><br>     Defendants and Respondents. | A142736<br><br>(San Francisco City & County<br>Super. Ct. No. CGC-09-492995) |

PegaStaff is an agency that provides temporary staffing for its clients. A large part of PegaStaff's business was the provision of staffing to Pacific Gas & Electric Company (PG&E), through a staffing agency with which PG&E directly contracted, initially Corestaff Services, LP (Corestaff) and later Agile 1.

The California Public Utilities Commission (PUC or commission) adopted General Order 156 (GO 156) to implement Public Utilities Code[1] sections 8281 through 8286 (Article 5),[2] the purpose of which is to encourage and develop the use of women-, minority-, and disabled veteran-owned business enterprises (minority enterprises) within the public utility sector.[3] PegaStaff is not a minority enterprise, and after PG&E adopted a program to increase the utilization of minority enterprises, PegaStaff's provision of labor to PG&E was substantially reduced. PegaStaff attributes this reduction to the

---

[1] Unless otherwise indicated, further statutory citations are to the Public Utilities Code.

[2] Sections 8281 through 8286 comprise article 5 of chapter 7 of the Public Utilities Code.

[3] As of January 1, 2015, lesbian-, gay-, bisexual- and transgender-owned business enterprises are also included in Article 5. (Stats. 2014, c. 633, § 3.5.)

implementation of a tier system preferential to minority enterprises and the transfer of many of its contingent workers to minority enterprises.

PegaStaff filed suit against the PUC, PG&E, Corestaff and Agile 1. Its claims against the PUC consisted of constitutional challenges to Article 5 and GO 156. The trial court determined that it did not have subject matter jurisdiction to consider PegaStaff's constitutional challenges, granted the PUC's motion for judgment on the pleadings, and entered judgment in favor of the PUC. We affirmed that judgment in *PegaStaff v. California Public Utilities Commission* (2015) 236 Cal.App.4th 374 (*PegaStaff I*).

PG&E, Corestaff and Agile 1 also filed motions for judgment on the pleadings, arguing that just as the trial court lacked subject matter jurisdiction to consider PegaStaff's causes of action against the PUC, it also lacked jurisdiction to consider the causes of action asserted against them. The trial court agreed and granted the motions for judgment on the pleadings.

In this appeal, PegaStaff maintains that the trial court erred in determining that it lacked subject matter jurisdiction to consider its claims against PG&E and Agile 1. We agree and reverse the trial court's judgments in favor of these defendants.[4]

In a separate petition for writ of mandate, PegaStaff maintains that the trial court erred in its determination that it lacked subject matter jurisdiction to consider its claims against Corestaff. We agree and grant PegaStaff's petition in a separate order, issued this day, that refers to this opinion for its reasoning.

## BACKGROUND[5]

The PUC is an agency created by the California Constitution to regulate privately owned public utilities such as PG&E. (Cal. Const., art. XII.)

---

[4] Because we reverse on the jurisdictional question, we do not reach PegaStaff's further assertions of error—that the trial court should have granted leave to amend or should have granted PegaStaff's motion for transfer of the matter to this court.

[5] Because this appeal is from a judgment on the pleadings, we state facts concerning PegaStaff and its transactions with the defendants as alleged in the complaint. (*DiPirro v. American Isuzu Motors, Inc.* (2004) 119 Cal.App.4th 966, 972.)

2

PegaStaff is a division of PegaSoft Corporation, a California corporation, that provides temporary staffing in the fields of information technology and engineering. Mark Arshinkoff, a white male, owns 100 percent of PegaSoft stock.

For nine years prior to filing suit, PegaStaff provided contract labor to PG&E through a program administered by Corestaff,[6] another staffing company. PegaStaff's placement of workers at PG&E peaked in 2007 at about 40 workers. In that year, PegaStaff received about 400 job orders and revenue of about $4.5 million from PG&E. The revenue from PG&E comprised about 50 percent of PegaStaff's gross revenues for the year.

In October 2007, at the direction of PG&E, Corestaff created a tier structure whereby all minority enterprises were placed in the first tier and all other businesses, such as PegaStaff, were placed in the second tier. First tier businesses received preference in job orders for temporary workers.

The number of PG&E job orders routed to PegaStaff declined substantially as a consequence of the tier structure. At the direction of PG&E, Corestaff "transferred many of the contingent workers placed by PegaStaff to the minority owned businesses," thereby harming PegaStaff financially. Between January and September 2009, PegaStaff received only one job order for PG&E from Corestaff and employed only four temporary workers at PG&E. In 2010, defendant Agile 1[7] replaced Corestaff as the administrator of PG&E's contingent worker program.

The operative first amended complaint (FAC) was filed on September 5, 2012, naming PG&E, Corestaff, Agile 1 and the PUC as defendants. The FAC asserts 10 causes of action: (1) violation of Civil Code section 51.5 (barring discrimination by businesses based on enumerated characteristics), asserted against Corestaff and PG&E; (2) violation of California Constitution, article I, section 31 (barring discrimination by the

---

[6] In Corestaff's answer to PegaStaff's complaint, it referred to itself as "Corporate Employment Resources, Inc. (Formerly, Corestaff Services, LP)."

[7] In Agile 1's answer to PegaStaff's complaint, it referred to itself as "The ACT 1 Group, Inc. (which does business as and was sued solely as AGILE 1)."

3

state based on race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting), asserted against the PUC; (3) violation of the equal protection clause of the California Constitution (Cal. Const., art. I, § 7), asserted against the PUC; (4) injunctive relief for violation of California's unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.), asserted against Corestaff and PG&E; (5) intentional interference with prospective economic advantage, asserted against PG&E; (6) negligent interference with prospective economic advantage, asserted against PG&E; (7) civil conspiracy, asserted against Agile 1; (8) intentional interference with prospective economic advantage, asserted against Agile 1; (9) negligent interference with prospective economic advantage, asserted against Agile 1; and (10) violation of the UCL, asserted against Agile 1.

On May 13, 2013, the PUC filed a motion for judgment on the pleadings, asserting that section 1759[8] deprives the superior court of subject matter jurisdiction over PegaStaff's two causes of action asserted against it. PegaStaff opposed the PUC's motion and moved for transfer of those causes of action to this court, should the trial court determine that it lacked jurisdiction.

On July 15, 2013, the court filed an order granting the PUC's motion for judgment on the pleadings and denying PegaStaff's motion for transfer. The court determined that pursuant to section 1759, it lacked jurisdiction to hear constitutional challenges to Article 5 and General Order 156. The court also entered judgment in favor of the PUC on July 15, 2013. PegaStaff appealed from the court's judgment, but we affirmed in *PegaStaff I*.

On July 9, 2013, Agile 1 filed a motion for judgment on the pleadings as to the causes of action asserted against it. On July 10, 2013, and July 17, 2013, respectively, PG&E and Corestaff filed their own motions for judgment on the pleadings. PegaStaff

---

**8** Section 1759, subdivision (a), provides: "No court of this state, except the Supreme Court and the court of appeal, to the extent specified in this article, shall have jurisdiction to review, reverse, correct, or annul any order or decision of the [PUC] or to suspend or delay the execution or operation thereof, or to enjoin, restrain, or interfere with the [PUC] in the performance of its official duties, as provided by the law and the rules of court."

4

opposed the motions and sought leave to amend should the motions be granted. PegaStaff also argued that if the court denied leave to amend, its suit against PG&E, Corestaff, and Agile 1 should be transferred to the Court of Appeal.

The trial court held a hearing on September 5, 2013, and granted the motions for judgment on the pleadings but reserved the issue whether to grant leave to amend. The court requested that PegaStaff provide a proposed second amended complaint (SAC) prior to a hearing scheduled for October 8, 2013. PegaStaff provided a proposed SAC on October 4, 2014. At the October 8, 2013 hearing, the court denied PegaStaff leave to amend because it believed that it did not "have jurisdiction over the matters set forth in the [SAC]."

On November 20, 2013, the court filed an order granting the defendants' motions for judgment on the pleadings. The order also denied PegaStaff leave to amend its complaint and denied PegaStaff's motion to transfer the matter to the Court of Appeal. On the same day, the court entered judgment in favor of PG&E. On November 22, 2013, the court entered judgment in favor of Agile 1. Corestaff did not submit a judgment on the trial court's order granting judgment on the pleadings and the court did not enter a separate judgment in favor of Corestaff.[9]

PegaStaff filed a notice of appeal on December 4, 2013. Corestaff filed a motion to dismiss PegaStaff's appeal for lack of an appealable judgment or order. On July 10, 2014, because we had before us appeals from judgments of dismissal in favor of PG&E and Agile 1 based on the same order from which PegaStaff sought to appeal with regard to Corestaff, we denied Corestaff's motion to dismiss and on our own motion treated the appeal as a petition for writ of mandate. On August 15, 2014, on our own motion, we bifurcated the writ petition with regard to Corestaff and the appeal with regard to PG&E and Agile 1 into two separate cases and notified the parties that the petition would be considered with the appeal. This appeal, case number A142736, concerns dismissal of

---

[9] Corestaff seeks to file a cross-complaint after a stay of proceedings, pending action by this court, is lifted.

5

the suit as to defendants PG&E and Agile 1.  The petition for writ of mandate, case number A140521, concerns the order granting Corestaff's motion for judgment on the pleadings.

## DISCUSSION

In an appeal from a motion granting judgment on the pleadings, " '[a]ll properly pleaded, material facts are deemed true, but not contentions, deductions, or conclusions of fact or law . . . .' " (*People ex rel. Harris v. Pac Anchor Transportation, Inc.* (2014) 59 Cal.4th 772, 777.)  We review the complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any theory.  (*Taiheiyo Cement U.S.A., Inc. v. Franchise Tax Bd.* (2012) 204 Cal.App.4th 254, 259.)  Here, the sole argument of the defendants in their motions for judgment on the pleadings and on appeal is not that PegaStaff failed to allege facts sufficient to state a cause of action, but that pursuant to section 1759, subdivision (a), the superior court lacks jurisdiction over the subject matter of the complaint.  Accordingly the question before us, which we consider de novo, is whether the superior court has subject matter jurisdiction over the causes of action arising from the properly pleaded, material facts contained in PegaStaff's FAC.  In addressing this question, we first consider the appeal as to defendant PG&E.  We then consider how that result as to PG&E affects the appeal as to defendant Agile 1 and the petition as to defendant CoreStaff.

### I.

### *Section 1759 Does Not Bar PegaStaff's Suit Against PG&E.*

**A.**     **Section 1759 and The *Covalt* Test**

We adopt the summary of the governing law concerning section 1759 as stated in *Sarale v. Pacific Gas & Electric Co.* (2010) 189 Cal.App.4th 225 (*Sarale*):

" 'The commission is a state agency of constitutional origin with far-reaching duties, functions, and powers . . . including the power to fix rates, establish rules, hold various types of hearings, award reparation, and establish its own procedures.' (*Consumers Lobby Against Monopolies v. Public Utilities Com.* (1979) 25 Cal.3d 891, 905, citing Cal. Const., art. XII, §§ 1–6.)  In addition, the Legislature, which has the

6

' "plenary power . . . to confer additional authority and jurisdiction upon the commission," ' can broaden the commission's authority. (*Consumers Lobby Against Monopolies*, *supra*, at p. 905, quoting Cal. Const., art. XII, § 5).

"Employing its plenary power, the Legislature enacted the Public Utilities Act (§ 201 et seq.), which 'vests the commission with broad authority to "supervise and regulate every public utility in the State." ' ([*San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893,] 915 [(*Covalt*)].) This broad authority authorizes the commission to ' "do all things, whether specifically designated in [the Public Utilities Act] or in addition thereto, which are necessary and convenient" in the exercise of its jurisdiction over public utilities.' (*Ibid.* italics omitted.) ' "The commission's authority has been liberally construed" [citation], and includes not only administrative but also legislative and judicial powers . . . .' (*Ibid.*)

"Commission action is subject to judicial review, the 'manner and scope' of which is established by the Legislature. (Cal. Const., art. XII, § 5.) 'Pursuant to this constitutional provision, the Legislature enacted article 3 of chapter 9 of the Public Utilities Act, entitled "Judicial Review . . ." (§ 1756 et seq.),' which 'prescribes a method of judicial review that is narrow in both "manner and scope." ' (*Covalt*, *supra*, 13 Cal.4th at p. 915.) Among the provisions of that article is subdivision (a) of section 1759, which provides that '[n]o court of this state, except the Supreme Court and the court of appeal, to the extent specified in this article, shall have jurisdiction to review, reverse, correct, or annul any order or decision of the commission or to suspend or delay the execution or operation thereof, or to enjoin, restrain, or interfere with the commission in the performance of its official duties, as provided by law and the rules of court.'

"Despite this limitation on the jurisdiction of trial courts to review commission rules and decisions, the Legislature has provided for a private right of action against utilities for unlawful activities and conduct. Specifically, section 2106 provides for an action to recover for loss, damage, or injury 'in any court of competent jurisdiction' by any corporation or person against '[a]ny public utility which does, causes to be done, or permits any act, matter, or thing prohibited or declared unlawful, or which omits to do

7

any act, matter, or thing required to be done, either by the Constitution, any law of this State, or any order or decision of the commission.'

" '[R]ecognizing a potential conflict between sections 2106 and 1759,' the California Supreme Court 'has held section 2106 "must be construed as limited to those situations in which an award of damages would not hinder or frustrate the commission's declared supervisory and regulatory policies." ' (*Koponen v. Pacific Gas & Elec. Co.* (2008) 165 Cal.App.4th 345, 351 (*Koponen*) . . . .)

"In *Covalt*, the Supreme Court ' "established a three-part test to determine whether an action is barred by section 1759: (1) whether the commission had the authority to adopt a regulatory policy; (2) whether the commission had exercised that authority; and (3) whether the superior court action would hinder or interfere with the commission's exercise of regulatory authority." ' " (*Sarale*, *supra*, 189 Cal.App.4th at pp. 235–236; see, e.g., *People ex rel. Orloff v. Pacific Bell* (2003) 31 Cal.4th 1132, 1144–1145; *Ford v. Pacific Gas & Electric Co.* (1997) 60 Cal.App.4th 696, 700–701.)

Superior court jurisdiction is precluded only if all three prongs of the *Covalt* test are answered affirmatively. (*Anchor Lighting v. Southern California Edison Co.* (2006) 142 Cal.App.4th 541, 549.)

The issue in *Covalt* was whether section 1759 barred a superior court action for nuisance and property damage allegedly caused by electric and magnetic fields from power lines owned and operated by a public utility. (*Covalt*, *supra*, 13 Cal.4th at p. 903.) The court, considering the third prong of the test, concluded that a superior court verdict for plaintiffs would be inconsistent with the PUC's conclusion "that the available evidence does *not* support a reasonable belief that 60 Hz electric and magnetic fields present a substantial risk of physical harm, and that unless and until the evidence supports such a belief regulated utilities need take no action to reduce field levels from existing powerlines." (*Id.* at p. 939.)

Since *Covalt* was decided, courts have had repeated occasion to apply the test it established. In *Hartwell Corp. v. Superior Court* (2002) 27 Cal.4th 256 (*Hartwell*), residents brought actions against, among others, water providers regulated by the PUC

8

for injuries caused by harmful chemicals in the water they supplied. (*Id.* at pp. 260-261.) Asserting tort and other causes of action, the plaintiffs sought damages and injunctive relief against those defendants. (*Ibid.*) The water companies argued that section 1759 deprived the superior court of jurisdiction over plaintiffs' claims. (*Id.* at p. 263.) The Supreme Court found that the first two prongs of the *Covalt* test were met: the CPUC had regulatory authority over water quality and safety and had exercised that authority. (*Id.* at pp. 269-274.) Applying *Covalt*'s third prong, it held that adjudication of some— but not all—of plaintiffs' claims against the regulated water companies would hinder or interfere with the CPUC's exercise of regulatory authority. (*Id.* at pp. 275-282.)

Plaintiffs' injunctive relief claims would interfere with the PUC's exercise of its authority because the PUC had determined that the water companies were in compliance with state water quality standards and impliedly declined to take remedial action against those companies. (*Hartwell*, *supra*, 27 Cal.4th at p. 278.) "A court injunction, predicated on a contrary finding of utility noncompliance, would clearly conflict with the PUC's decision and interfere with its regulatory functions in determining the need to establish prospective remedial programs." (*Ibid*.) Plaintiffs' damages claims were also barred by section 1759 to the extent they sought to recover for harm caused by water that met state standards but allegedly was unhealthy nonetheless. (*Id*. at pp. 275-276.) Although the PUC had simply incorporated the water quality standards adopted by DHS, those standards were key to its exercise of rate setting authority because the standards enabled it to determine whether water company revenues were sufficient to finance water safety treatment. (*Id.* at p. 276.) Moreover, the PUC had "provided a safe harbor" for water companies if they complied with the DHS standards, and that policy would be undermined by allowing damages for provision of water that met those standards. (*Ibid*.)

However, the court rejected the water companies' contention that section 1759 deprived the superior court of jurisdiction over the claims seeking damages for harm resulting from water that *failed* to meet the incorporated water quality standards: "A jury award based on a finding that a public water utility violated DHS standards would not interfere with the PUC regulatory policy requiring water utility compliance with those

standards." (*Hartwell*, *supra*, 27 Cal.4th at p. 276.) The Legislature had afforded the PUC means to redress violations of the standards, such as mandamus, injunctive relief, penalties and contempt, but "these remedies are essentially prospective in nature. They are designed to stop the utilities from engaging in current and ongoing violations and do not redress injuries for past wrongs. . . . Because the PUC cannot provide for such relief for past violations, those damage actions would not interfere with the PUC in implementing its supervisory and regulatory policies to prevent future harm." (*Id*. at p. 277.)[10] Thus, plaintiffs' damage claims alleging water contamination that violated the DHS standards were authorized under section 2106. (*Id*. at p. 279.)

The *Hartwell* court also held that the plaintiffs' claims against water companies and industrial defendants that were not subject to PUC regulatory authority were not barred by section 1759. (*Hartwell*, *supra*, 27 Cal.4th at pp. 279-282.) It rejected an interpretation of section 1759 so broad that any adjudication that could result in a decision inconsistent with a PUC decision in another proceeding would for that reason alone fall outside the superior courts' jurisdiction. (*Ibid.*) " 'By no stretch of language or logic does [section 1759] mean that trial courts may not decide issues between parties not subject to PUC regulation simply because the same or similar issues are pending before the PUC or because the PUC regulates the same subject matter in its supervision over public utilities.' " (*Id*. at p. 280, quoting and agreeing with part of the Court of Appeal decision under review.) Although "section 1759 does not expressly restrict preemption to claims involving regulated utilities," it had to be read in context with the regulatory scheme of which it is a part. (*Ibid*.) The PUC's regulatory authority extended only to regulated utilities, which endowed certain business enterprises "affected with a public interest" with a legally sanctioned monopoly and subjected them in turn to

---

[10] This was so even though the PUC had, in an earlier information gathering proceeding, found that the regulated water companies had substantially complied with the standards for the past 25 years. That finding of past compliance was not part of a supervisory, regulatory, rulemaking or enforcement proceeding, and while it could lead to prospective relief, it could not result in redress for past violations. (*Hartwell*, *supra*, 27 Cal. 4th at pp. 276-277.)

comprehensive regulation of rates, services and facilities, as well as liabilities that were defined and limited. (*Id*. at pp. 281-282.) Unlike those entities, nonregulated companies were not subject to PUC jurisdiction and would be exempt from claims in any forum if the superior court lacked jurisdiction. (*Id*. at p. 282.)

*Hartwell* demonstrates that application of the third prong of *Covalt* does not turn solely or primarily on whether there is overlap between conduct regulated by the PUC and the conduct targeted by the suit. The fact that the PUC has the power and has exercised the power to regulate the subject at issue in the case establishes the first and second prongs of *Covalt*, but will not alone establish the third. Instead, the third prong requires a careful assessment of the scope of the PUC's regulatory authority and evaluation of whether the suit would thwart or advance enforcement of the PUC regulation. Also relevant to the analysis is the nature of the relief sought—prospective relief, such as an injunction, may sometimes interfere with the PUC's regulatory authority in ways that damages claims based on past harms would not. Ultimately, if the nature of the relief sought or the parties against whom the suit is brought fall outside the PUC's constitutional and statutory powers, the claim will not be barred by section 1759.

In *Koponen*, plaintiffs filed a class action seeking damages and other relief after PG&E leased or licensed rights in easements burdening plaintiffs' property to telecommunications companies for the purposes of installing and using fiber optic lines. (*Koponen*, *supra*, 165 Cal.App.4th at p. 348.) The PUC had granted applications by PG&E to enter into such leases or licenses. (*Id.* at p. 351.) The court found the PUC met the first prong of *Covalt*: the PUC had "power to regulate PG&E's use of its facilities, including the power to regulate whether PG&E may install fiber optic lines or license or lease its facilities to providers of telecommunications services" and "the power to determine how revenues from PG&E's leases or licenses must be allocated or distributed." (*Id.* at pp. 352-353.) The second *Covalt* prong was also met because the commission had "exercised its regulatory power by authorizing PG&E to enter into specific licensing or leasing agreements and also by determining how resulting revenues will be allocated." (*Id*. at p. 353)

11

The court then considered whether the third *Covalt* prong was met, i.e., whether the plaintiff's suit "could hinder or interfere with the commission's exercise of its authority to determine what use PG&E can make of its facilities or how revenues generated from that use should be allocated." (*Koponen*, *supra*, 165 Cal.App.4th at p. 353.)  Plaintiffs claimed PG&E's attempts to sell to telecommunications providers use of rights-of-way that PG&E did not own trenched on plaintiffs' property rights, and the court held the PUC had no regulatory authority or interest in private disputes over property rights between PG&E and private landowners.  (*Ibid.*)  "[T]he commission has no authority to determine the property dispute between plaintiffs and PG&E, and it does not matter that the commission has approved PG&E's applications.  The commission certainly can determine that the applications are in the public interest, . . . but neither that finding nor the commission's approval of the applications in any way determined the extent of PG&E's rights in the easements." (*Id.* at pp. 355-356.)  The court held plaintiffs' damages claims were not barred by section 1759.  (*Id.* at p. 358.)  However, it also held that plaintiffs could not seek relief in the nature of disgorgement of profits or other relief requiring PG&E to pay to plaintiffs some or all of the revenues from leasing or licensing its facilities:  "The commission, as part of its ratemaking authority, has determined how those revenues are to be allocated.  An award of relief that effectively redirects the payment of those revenues would directly contravene or annul the commission's decisions." (*Ibid.*)

Just as *Hartwell* teaches that a claim against persons over whom the PUC lacks jurisdiction cannot meet *Covalt*'s prong three, *Koponen* similarly teaches that a claim concerning subjects over which the PUC lacks regulatory authority does not meet prong three for the same reason:  there can be no interference with authority the PUC does not have.  That is so even if the PUC's regulatory goals could indirectly be advanced or hindered by a ruling on the claim.

*Wilson v. Southern California Edison Co.* (2015) 234 Cal.App.4th 123 (*Wilson*) was an appeal from a jury verdict awarding plaintiff substantial tort damages based on the utility's failure to properly supervise, secure, operate, maintain or control its electrical

12

substation, allowing stray electrical currents to enter plaintiff's home. (*Id.* at p. 129.) In an amicus brief, the PUC asserted that it had ongoing policies and programs governing the safety of such facilities, that its regulatory programs ensured requirements imposed on utilities would be uniform, and that a trial court decision in a case like *Wilson* could " 'unintentionally result in new or inconsistent requirements regarding the design, construction, operation, maintenance, and safety of utility equipment and facilities.' " (*Id.* at pp. 147-148.) The court noted that PUC regulations "specifically address grounding, including grounding requirements for common neutral systems" such as the electrical substation in question. (*Id.* at p. 149.) These regulations required that grounding be " 'effective' " and "set forth detailed minimum requirements for ground conductors." (*Ibid.*)

Despite the PUC regulations, the *Wilson* court concluded that the *Covalt* test was not satisfied. (*Wilson*, *supra*, 234 Cal.App.4th at p. 149.) "First, although there is no doubt that [PUC general orders] require grounding of substations, it may be that [defendant] could comply with the regulations and still mitigate the stray voltage that results from grounding. Although that is an issue that is more appropriately submitted to the [PUC] under the primary jurisdiction doctrine [citation], it does not mean that [plaintiff's] claims are barred under the *Covalt* test." (*Id.* at pp. 149-150.) Second, the PUC's general orders did not provide guidance as to how utilities operate and maintain their substations, and no specific regulations governed substation operation. (*Id.* at p. 150.) Instead, the PUC ordered the utilities to meet annually to share their newly developed practices with the expectation that a best practice would evolve. (*Ibid.*) The court concluded: "it is unclear whether this 'best practice' will address stray voltage issues. Therefore, we cannot say with any certainty that litigation of [plaintiff's] claims would hinder or interfere with the PUC's regulatory policy." (*Ibid.*) "Finally, the purported exercise of authority that [defendant] relies upon is of a vastly different character than the kinds of exercise of authority found in cases in which courts . . . found that section 1759 bars the plaintiff's action. In most of those cases, the PUC conducted (or was in the process of conducting) investigations into or adopted regulations on the

specific issue alleged in the plaintiff's lawsuit. [Citations.] [¶] In light of the absence of any indication that the PUC has investigated or regulated the issue of stray voltage, and without any evidence that stray voltage cannot be mitigated without violating the PUC's regulation requiring grounding, we cannot say that [plaintiff's] lawsuit would interfere with or hinder any supervisory or regulatory policy of the PUC. Therefore, we hold that Wilson's claims are not within the exclusive authority of the PUC under section 1759." (*Id.* at pp. 150-151.)

Where the PUC has promulgated "minimum requirements," *Wilson* establishes that merely meeting those requirements does not necessarily insulate a utility from a superior court suit. Even if a utility meets a minimum requirement set by the PUC, the interference prong of the *Covalt* test is not met by a suit claiming the utility should have done more, at least in the absence of a PUC safe harbor (as was the case in *Hartwell*) that blesses the minimum requirement as fully meeting the utility's obligation. Without more than speculation that the PUC might establish additional or different requirements in the future, section 1759 will not deprive the superior court of jurisdiction if the utility could comply with current PUC requirements and still avoid injuring the plaintiff. The contrast between two cases, *Sarale* and *Mata v. Pacific Gas and Electric Co.* (2014) 224 Cal.App.4th 309 (*Mata*), clarifies this teaching.

In *Sarale*, plaintiffs claimed PG&E had excessively trimmed commercially productive walnut trees under its power lines. (*Sarale*, *supra*, 189 Cal.App.4th at p. 230.) PUC regulations established minimum clearances to be maintained between power lines and vegetation, but also recognized that "[v]egetation management practices may make it advantageous to obtain greater clearances" than the minimum. (*Id.* at pp. 237-239.) Plaintiffs claimed that PG&E's tree trimming was excessive "based on past vegetation management practices" because it was "beyond PG&E's historical tree trimming practices" on the property, not because it was objectively unreasonable given the totality of the circumstances. (*Id.* at p. 242.) The *Sarale* court applied *Covalt* and, in a split decision (J. Robie dissenting), ruled the suit was barred in superior court: "Section 1759 saves the commission and utility companies from defending against myriad lawsuits

14

every time adjustments are made to protocols for vegetation management around power lines." (*Ibid.*)

In *Mata*, plaintiffs sued PG&E and a tree trimming company after a man was electrocuted by a high voltage power line while trimming a tree. (*Mata*, *supra*, 224 Cal.App.4th at p. 312.) Plaintiffs sued both defendants for negligence and PG&E for premises liability, based on the allegation that defendants failed to maintain an adequate clearance of the power lines from the trees. (*Ibid.*) The *Mata* court considered the same PUC regulations as the *Sarale* court (*id.* at p. 316) and observed: "the PUC rules and prior orders repeatedly make clear that while a utility normally must maintain specified minimum clearances between its overhead electric lines and adjacent trees, the commission leaves to the determination of the utility whether greater clearances are necessary at particular locations to accomplish the purposes of [the regulations], including to 'secure safety . . . to the public in general.' Nowhere in its rules or orders does the commission suggest that in making such determinations, the utility is relieved of its obligation to exercise reasonable care to avoid causing harm to others, or relieved of its responsibility for failing to do so." (*Id.* at p. 318.) The court concluded that the suit was not barred by section 1759. (*Id.* at p. 320.)

In reaching its decision, the *Mata* court considered the majority opinion and the dissent in *Sarale*, but determined it was "unnecessary to take sides" "because there is a fundamental difference between the claims in [*Sarale*] and plaintiffs' claim here. In *Sarale*, the landowners were attempting to prohibit PG&E from trimming more than the minimum required by the PUC, although—as indicated above—the PUC has made unmistakably clear that in some cases safety or other considerations require more than minimum clearances and that the utility should use its judgment to go beyond the minimum when necessary to ensure the reliability of service or public safety. In the view of the majority, recognition of the landowners' claims would have effectively countermanded the authorization that the PUC granted the utility to make that determination and to extend clearance beyond the minimum when necessary to ensure service reliability or public safety. Here, on the other hand, plaintiffs' claims do not

15

conflict with the PUC rule authorizing the utility to make a reasonable determination whether safety or other considerations require trimming beyond the minimum clearance. Permitting plaintiffs to prosecute in superior court their claim for having failed to use due care in making such a determination does not hinder or interfere with the exercise of the PUC's authority. To the contrary, awarding damages to those injured by the utility's failure to make such a reasonable determination as anticipated by the PUC complements and reinforces [the regulations]. A superior court action for such damages is 'in aid of, rather than in derogation of, the PUC's jurisdiction.' " (*Mata*, *supra*, 224 Cal.App.4th at pp. 319-320.)

Like several of the prior cases, *Sarale* and *Mata* address a utility's acts in relation to a minimum safety standard established by the PUC. The *Sarale* plaintiffs argued the utility went too far and caused property damage, whereas the *Mata* plaintiffs argued it failed to go far enough, resulting in personal injury. The PUC regulation allowed utilities to go farther than the minimum, and *Sarale* held that a suit penalizing a utility for doing so would interfere with the regulation. *Mata* also interpreted the regulation to allow utilities to exceed the minimum but further held that the PUC "made unmistakably clear that in some cases safety or other considerations require more than minimum clearances and that the utility should use its judgment to go beyond the minimum when necessary to ensure the reliability of service or public safety." (*Mata*, *supra*, 224 Cal.App.4th at p. 319.) *Mata* is thus similar to *Wilson* in holding that meeting a minimum standard established by the PUC does not by itself insulate a utility from liability for injuries resulting from its failure to do more. And like *Hartwell*, it focuses on whether the suit would advance or thwart the PUC's regulatory goals.

## B.     Application of the *Covalt* Test

The subject matter of PegaStaff's suit concerns PG&E's minority enterprise diversity program. We first consider whether the PUC is authorized to regulate such diversity programs. If it is, we next consider whether the PUC has exercised that authority. If it has, the final question is whether PegaStaff's superior court action against PG&E will interfere with or frustrate the PUC's exercise of regulatory authority.

16

### 1.     *The PUC Has the Authority to Regulate Utility Minority Enterprise Diversity Programs.*

Article 5 declares as state policy "to aid in the interests of [minority enterprises] in order to preserve reasonable and just prices and a free competitive enterprise, to ensure that a fair proportion of the total purchases and contracts or subcontracts for commodities, supplies, technology, property, and services for regulated public utilities, including, but not limited to, renewable energy, wireless telecommunications, broadband, smart grid, and rail projects, are awarded to [minority enterprises], and to maintain and strengthen the overall economy of the state."  (§ 8281, subd. (a).)

In furtherance of that policy, Article 5 authorizes and directs the PUC to:  (1) require utilities to submit an annual, detailed, and verifiable plan for increasing procurement from minority enterprises (§ 8283, subd. (a)); (2) establish guidelines for utilities to use in establishing programs pursuant to Article 5 (§ 8283, subd. (c)); (3) "recommend a program for carrying out the policy" of Article 5 (§ 8283, subd. (e)(1)); and (4) file an annual report with the Legislature on the progress of activities undertaken by utilities in the implementation of such programs (§ 8283, subd. (e)(1)).  Article 5 also requires that utilities' annual plans "include short- and long-term goals and timetables, but not quotas, and . . . include methods for encouraging both prime contractors and grantees to engage [minority enterprises] in subcontracts in all categories that provide subcontracting opportunities."  (§ 8283, subd. (b).)

Article 5 authorizes the PUC to regulate utility minority enterprise diversity programs.[11]  Accordingly, *Covalt* prong one is met.

### 2.     *The PUC Has Exercised Its Authority to Regulate Utility Minority Enterprise Diversity Programs.*

To implement Article 5, the PUC issued Decision 88-04-057, in which it adopted an interim order that later became GO 156.[12]  (*Re Public Utilities Code Sections 8281 to*

---

[11]  PegaStaff disputes that the first two prongs of the *Covalt* test are met, but does so by repeating arguments that we rejected in *PegaStaff I*.

[12]  GO 156 is available at <http://docs.cpuc.ca.gov/PublishedDocs/PUBLISHED/GRAPHICS/171157.PDF>.

*8285 Relating to Women and Minority Business Enterprises* (1988) 28 Cal.P.U.C.2d 36.) It has since amended GO 156 many times, most recently in 2011. (GO 156, p. 1.)

GO 156 states its intent as follows: "Purpose–These rules implement [Article 5] which require[s] the Commission to establish a procedure for gas, electric, and telephone utilities with gross annual revenues exceeding $25,000,000 and their Commission-regulated subsidiaries and affiliates to submit annual detailed and verifiable plans for increasing [minority enterprise] procurement in all categories." (GO 156, § 1.1.1, p. 7.)

Section 2 of GO 156 provides rules and guidelines to "be used to verify the eligibility of women and minority business enterprises . . . for participation in utility [minority enterprise] procurement programs." (GO 156, § 2, p. 9.)

Section 3 provides that the PUC "shall provide a clearinghouse for the sharing of [minority enterprise] identification and verification information." (GO 156, § 3, p. 10.)

Section 4 concerns the qualification of a business as a service disabled veteran business enterprise. (GO 156, § 4, p. 10.)

Section 6[13] concerns the implementation of utility minority enterprise diversity programs: "Each utility's [minority enterprise] program shall be designed to ensure that [minority enterprises] are encouraged to become potential suppliers of products and services to the utilities subject to GO 156. Nothing in GO 156 authorizes or permits a utility to utilize set-asides, preferences, or quotas in administration of its [minority enterprise] program. The utility retains its authority to use its legitimate business judgment to select the supplier for a particular contract." (GO 156, § 6, p. 11.)

Section 6.1 concerns internal utility program development. (GO 156, § 6.1, p. 11.) Utilities must maintain a staff appropriately sized to implement minority enterprise program requirements and provide appropriate staff training. (*Ibid.*)

Section 6.2 concerns the external outreach component of utility minority enterprise diversity programs. Utilities must "implement an outreach program to inform and recruit [minority enterprises] to apply for procurement contracts." (GO 156,

---

[13] Section 5 was deleted by a 1998 PUC decision. (GO 156, § 5, p. 11.)

§ 6.2, p. 11.) Minimum requirements for an outreach program are specified: (1) "Actively seek out opportunities to identify [minority enterprise] contractors and to expand [minority enterprise] source pools." (*Id.* § 6.2.1(1), p. 11.) (2) "Actively support the efforts of organizations experienced in the field who promote the interests of [minority enterprise] contractors." (*Id.* § 6.2.1(2), p. 11.) (3) "Work with [minority enterprise] contractors to facilitate contracting relationships . . . ." (*Id.* § 6.2.1(3), p. 11.) (4) "At the request of any unsuccessful [minority enterprise] bidder, provide information concerning the relative range/ranking of the [minority enterprise] contractor's bid as contrasted with the successful bid." (*Id.* § 6.2.1(4), p. 11.) (5) "To the extent possible, make available to [minority enterprise] contractors lists of utility purchase/contract categories which offer them the best opportunity for success." (*Id.* § 6.2.1(5), p. 12.) (6) "Encourage employees involved in procurement activities to break apart purchases and contracts as appropriate to accommodate the capabilities of [minority enterprises]." (*Id.* § 6.2.1(6), p. 12.) (7) Summarize GO 156 in outreach program handouts. (*Id.* § 6.2.1(7), p. 12.) The assistance that utilities provide to minority enterprises in their outreach programs must also be provided to non-minority enterprises on request. (*Id.* § 6.2.1(8), p. 12.)

Section 6.3 concerns the subcontracting program component of utility minority enterprise outreach programs. (GO 156, § 6.3, p. 12.) The purpose of the subcontracting program is to "encourag[e] [the utility's] prime contractors to utilize [minority enterprise] subcontractors." (*Ibid.*) "Each utility shall encourage and assist its prime contractors to develop plans to increase the utilization of [minority enterprises] as subcontractors. Prime contractors shall be encouraged to submit to the utility plans that include goals for the utilization of [minority enterprises] as subcontractors. These plans may be incorporated into the contract between the utility and the prime contractor." (*Id.* § 6.3.4, p. 12.) Utilities are "encouraged" to incorporate suggested language in purchase orders, requests for bid proposals, and "other appropriate procurement documents." (*Id.* § 6.3.5, p. 13.) The suggested language includes: "It is the policy of the utility that [minority enterprises] shall have the maximum practicable opportunity to participate in the

19

performance of contracts. However, this policy shall not be used to exclude qualified non-[minority enterprises] from participating in utility contracting." (*Id.* § 6.3.5(1), p. 13.)

Section 7 concerns the process for complaints relating to GO 156. (GO 156, § 7, pp. 14-15.) Section 7.1 provides: "Complaints relating to this General Order shall be filed and appealed only pursuant to the procedure set forth in this section 7. The Commission will not, however, entertain complaints which do not allege violations of any law, Commission rule, order, or decision or utility tariff resulting from such Commission action, but which instead involve only general contract-related disputes, such as failure to win a contract award." The "procedure set forth in this Section 7" is provided in sections 7.2 and 7.3, which concern complaints relating to minority enterprise verification decisions.

Section 8 concerns the goals utilities must set. A "goal" is defined in section 1.3.13 as "a target which, when achieved, indicates progress in a preferred direction. A goal is neither a requirement nor a quota." (GO 156, § 1.3.13, p. 8.) Utilities are required to "set substantial and verifiable short-term (one year), mid-term (three years), and long-term (five years) goals for the utilization of [minority enterprises]. Goals shall be set annually for each major product and service category which provides opportunities for procurement. 'Substantial Goals' mean goals which are realistic and clearly demonstrate a utility's commitment to encourage the participation of [minority enterprises] in utility purchases and contracts." (GO 156, § 8, p. 16.) Utilities must also set "initial minimum long-term goals for each major category of products and services the utility purchases from outside vendors of not less than 15% for minority owned business enterprises and not less than 5% for women owned business enterprises." (*Id.* § 8.2, p. 16.) "The specification of initial long-term goals in this section shall not prevent the utilities from seeking to reach parity with public agencies, which the Legislature found in Public Utilities Code Section 8281(b)(1)(13) are awarding 30% or more of their contracts to [minority enterprises]." (*Id.* § 8.3, p. 17.) "No penalty shall be imposed for failure of any utility to meet and/or exceed goals." (*Id.* § 8.12, p. 19.)

20

Section 9 concerns the annual report that utilities are required to submit concerning their minority enterprise diversity programs. (GO 156, § 9, pp. 19-21.) Section 10 concerns the requirements for a utility's annual plan—"a detailed and verifiable plan for encouraging [minority enterprise] procurement in all categories." (*Id.* § 10, pp. 21-22.) Section 11 concerns the PUC's annual report to the Legislature. (*Id.* § 11, p. 22.)

GO 156 represents PUC's exercise of its authority to regulate utility minority enterprise diversity programs. Accordingly, *Covalt* prong two is satisfied.

### 3. *Superior Court Action on PegaStaff's Suit Against PG&E Will Not Interfere with or Frustrate the PUC's Regulatory Authority.*

In its FAC, PegaStaff makes two material factual allegations concerning PG&E: (1) PG&E directed Corestaff to implement a tier system, under which minority enterprises were given preference for job orders and (2) PG&E directed Corestaff to transfer PegaStaff's contingent workers to minority enterprises. On appeal, PegaStaff confirms that these acts are the bases for its causes of action against PG&E. In other allegations, the FAC associates the two material allegations about PG&E's actions with GO 156, the import of which is that (1) PG&E was motivated to act as it did in order to achieve its GO 156 goals and (2) PG&E's acts were necessary to comply with GO 156. Whether PG&E was motivated by a desire to meet its goals is a question of fact that may or may not be relevant to the causes of action asserted against PG&E or PG&E's defenses, but insofar as that is part of what is alleged, it is a fact that has no bearing on the *Covalt* question of whether deterring PG&E's conduct (with damages or an injunction under the UCL) will interfere with the PUC's exercise of its regulatory authority. On the other hand, whether PG&E's acts were necessary for it to comply with GO 156 is a question of law that is relevant to the *Covalt* analysis and is a matter we now consider.[14]

---

[14] PG&E seems to argue that simply because PegaStaff makes the allegation that PG&E's actions were required by GO 156, we must proceed in our *Covalt* analysis as if that were the case. Whether PG&E's alleged actions were required by GO 156 is a legal contention or conclusion. In reviewing an order granting judgment on the pleadings, " '[a]ll properly pleaded, material facts are deemed true, but not contentions, deductions,

21

PG&E's conduct, as alleged, could not have been necessary to comply with GO 156 because both GO 156 and PUC decisions make clear that utilities are not authorized or permitted to give preferential treatment to minority enterprises. In *Re Rulemaking to Revise General Order 156* (1998) 83 Cal.P.U.C.2d 57, the PUC stated: "In D.96-04-018, we proposed amendments to Section 6 of GO 156 in order to make absolutely clear, as we have stated in prior decisions, that our [minority enterprise diversity] program is an equal opportunity program, aimed at maximizing participation of [minority enterprises] in utility procurement contracting. It is not a set-aside program. These Proposed Amendments to Section 6 were aimed at reaffirming that utilities are not authorized or permitted to design their [minority enterprise diversity] programs utilizing set-asides, quotas, preferences, or preferential treatment." (*Id.* at p. 59, fn. omitted.) In that PUC decision, the initial paragraph of GO 156 section 6 was changed to the following, which remains the current language: " 'Each utility's [minority enterprise ] program shall be designed to ensure that [minority enterprises] are encouraged to become potential suppliers of products and services to the utilities subject to GO 156. *Nothing in GO 156 authorizes or permits a utility to utilize set-asides, preferences, or quotas in administration of its [minority enterprise diversity] program. The utility retains its authority to use its legitimate business judgment to select the supplier for a particular contract.*' " (*Id.* at pp. 60, 68-69, italics added.).

The PUC could not have stated more explicitly that utilities are not permitted to achieve their GO 156 goals by use of preferences. There can be no doubt that the tier system as described in PegaStaff's FAC is a preferential system. Minority enterprises are in the first tier; non-minority enterprises are in the second tier; and job orders are given to first tier businesses in preference to second tier businesses. Superior court action on a claim based on a preferential system will not hinder or obstruct the PUC's exercise of regulatory authority. To the contrary, just as in *Hartwell* and *Mata*, this suit will enforce,

---

or conclusions of fact or law . . . .' " (*People ex rel. Harris v. Pac Anchor Transportation, Inc.*, *supra*, 59 Cal.4th at p. 777.)

22

not obstruct, the PUC regulation. (See *Hartwell*, *supra*, 27 Cal.4th at p. 275 ["superior courts are not precluded from acting in aid of, rather than in derogation of, the PUC's jurisdiction"]; *Mata*, *supra*, 224 Cal.App.4th at p. 320 ["awarding damages to those injured by the utility's failure to make such a reasonable determination as anticipated by the PUC complements and reinforces" PUC regulation].) This is not a case such as *Sarale*, on which PG&E heavily relies, in which PG&E's challenged actions merely exceed PUC minimum requirements in a fashion explicitly permitted by the PUC. Establishing a preferential tier system is an act explicitly prohibited by the PUC, not one explicitly committed to the utility's discretion. Here, a superior court action granting relief for PG&E's use of a preference system serves to enforce the PUC's prohibition of preferences in minority enterprise diversity programs and does not derogate from the PUC's regulatory authority or jurisdiction.

PegaStaff's other specific allegation of wrongful conduct is PG&E's involvement in transferring PegaStaff's contingent workers to minority enterprises. PUC decisions and GO 156 provide no basis for considering the alleged conduct to be an activity that the PUC would sanction. First, as we have noted, GO 156 minority enterprise diversity programs are described by the PUC as equal opportunity programs in which preferential treatment has no place. The transfer of PegaStaff's contingent workers, whose labor PG&E presumably wished to engage, but from a minority enterprise labor provider rather than PegaStaff, constitutes preferential treatment. Second, utilities must design their minority enterprise diversity programs "to ensure that [minority enterprises] are encouraged to become potential suppliers of products and services." (GO 156, § 6, p. 11.) The alleged transfer of workers goes far beyond encouragement. Third, although GO 156 suggests that utilities engage in activities that will assist minority enterprises in successfully bidding for contracts, such as providing lists of purchase/contract categories to minority enterprises and encouraging utility employees to break apart purchases and contracts to accommodate a minority enterprise's capabilities, none of the suggested activities bears any resemblance to the alleged interference with PegaStaff's contingent workers. Finally, the transfer of PegaStaff's workers appears to have been part and

parcel of an alleged preference program that PegaStaff maintains resulted in depriving it of opportunities to contract with PG&E. In this respect, it was contrary to the PUC's suggested language for utility procurement documents, providing that the policy of "maximum practicable opportunity" for minority enterprises "shall not be used to exclude qualified non-[minority enterprises] from participating in utility contracting." (GO 156, § 6.3.5(1), p. 13.)

In *Koponen*, the court concluded that the PUC had no "interest in private disputes over property rights between PG&E and private landowners." (*Koponen*, *supra*, 165 Cal.App.4th at p. 352.) Similarly, here, the PUC has affirmed a "policy of the utilities' procurement management decisionmaking prerogative about how best to structure their own individual [minority enterprise diversity] programs" and a policy "of not micromanaging the utilities' procurement decisions." (*Re Rulemaking to Revise General Order 156* (1998) 83 Cal.P.U.C.2d 57, 61.) Because the PUC has specifically declined to regulate the details of utility minority enterprise diversity programs beyond pronouncing in GO 156 a limited set of specific requirements and some broad prohibitions, a superior court action on PegaStaff's causes of action will not hinder or interfere with the PUC's regulatory authority or policies. In most of the cases finding a section 1759 jurisdictional bar "the PUC conducted (or was in the process of conducting) investigations into or adopted regulations on the specific issue alleged in the plaintiffs' lawsuit." (*Wilson*, *supra*, 234 Cal.App.4th at p. 150.) Here, the only PUC regulations concerning PegaStaff's specific allegations are *prohibitions* on utilities engaging in such acts, and superior court actions enforcing PUC prohibitions do not interfere with the PUC's regulatory authority. This is not a case, such as the claims that *Hartwell* held were barred, " 'holding the utility liable for not doing what the commission has repeatedly determined that it and all similarly situated utilities were not required to do.' " (*Hartwell*, *supra*, 27 Cal.4th at p. 276, quoting *Covalt*, *supra*, 13 Cal.4th at p. 950.) Rather, it is more like the claims that *Hartwell*, *Wilson*, and *Mata* allowed to proceed in superior court—damages claims based on past conduct that was not approved by the PUC, even though related to subject matter over which the PUC does exercise regulatory authority.

Moreover, as in those cases, we see no reason why PG&E cannot meet all that is required of it by GO 156 without engaging in the specific acts that are the basis of PegaStaff's complaint. Finally, the relief sought by PegaStaff is not in the nature of disgorgement of profits or other revenues explicitly approved, or the allocation of which was determined, by the PUC. It thus does not interfere with the PUC's rate setting authority as did some of the relief sought in *Koponen*.

PG&E's arguments that a superior court action on PegaStaff's claims against it would interfere with the PUC's regulatory authority are unconvincing. PG&E takes it as a given that PegaStaff's claims arise from PG&E's compliance with GO 156, repeatedly making that assertion: "PegaStaff's claims against PG&E all arise from PG&E's adherence to [GO] 156"; "PegaStaff's claims against PG&E are solely that PG&E acted wrongfully by complying with the Order"; "Pegastaff's suit against PG&E for adhering to [GO] 156 . . ."; "All of Pegastaff's claims against PG&E arise from PG&E's compliance with [GO] 156." Nowhere does PG&E substantively discuss PegaStaff's material allegations concerning the preferential tier system and the transfer of PegaStaff's contingent workers, much less attempt to show that its acts were necessary to comply with, rather than in blatant disregard of, GO 156.

PG&E also argues that a superior court action on PegaStaff's claims would interfere with the PUC's regulatory authority, but bases its argument on a false premise. "The FAC seeks to enjoin [GO 156] and its enabling statutes, and to enjoin PG&E's supplier diversity plan adopted pursuant to [GO 156]. . . . PegaStaff's claims against PG&E thus directly interfere with the [PUC's] policy and exercise of authority, and are barred by Section 1759." True, PegaStaff sought to enjoin enforcement of GO 156 and sought a ruling that Article 5 and GO 156 were unconstitutional, but that relief was sought in the causes of action against the PUC, the dismissal of which we previously affirmed, not in the causes of action against PG&E, which concern the tier system and the transfer of PegaStaff's contingent workers to minority enterprises. Nowhere does PG&E attempt to explain how a superior court action on the specific claims and allegations regarding PG&E would interfere with the PUC's regulatory authority.

25

PG&E makes no argument that even if a damages action for its past conduct is within the superior court's jurisdiction, injunctive relief under the UCL would not be. Although *Hartwell* concluded that an injunction would "interfere with [the PUC's] regulatory functions in determining the need to establish prospective remedial programs," that conclusion was based on a factual finding by the PUC that the utility defendants were currently in compliance with water standards and an implied determination that the PUC need not take any remedial action. (*Hartwell*, *supra*, 27 Cal.4th at p. 278.) Here, unlike *Hartwell*, there has been no PUC determination that PG&E's actions comply with GO 156 or that prospective remedial action is unnecessary. Accordingly, we have no reason to conclude that section 1759 bars PegaStaff's prayer for injunctive relief under the UCL.

PegaStaff's causes of action against PG&E are based on its allegations that PG&E instituted a preferential tier system and interfered with PegaStaff's contingent workers, transferring them to minority enterprises. A superior court action on these claims will not interfere or obstruct either PUC policy as stated in its decisions and GO 156 or its regulatory authority. Enjoining the alleged activity or awarding damages for it will not be in derogation of any provision in GO 156 or prevent PG&E from complying with that general order. Rather, deterring PG&E's alleged conduct will enforce prohibitions the PUC has clearly stated, so that a superior court action would be in aid, not derogation, of PUC authority.

At oral argument, defendants argued for the first time that a superior court action would interfere with the PUC's authority under section 7 of GO 156 to consider complaints relating to that order.[15] While section 7 is not a model of clarity, when read as a whole it plainly addresses only complaints concerning minority enterprise verification decisions. The "procedure" that section 7.1 prescribes as governing disputes

---

**15** The defendants waived this argument by not raising it in their respondents' briefs. However, since the question goes to the superior court's jurisdiction to hear this case, we must address it nonetheless.

is set forth in sections 7.2 and 7.3, which pertain solely to complaints regarding minority verification decisions.

This is quite unlike the broadly worded provision discussed in *Davis v. Southern California Edison Co.* (2015) 236 Cal.App.4th 619 (*Davis*), which reserved to the PUC " 'initial jurisdiction to interpret, add, delete or modify any provision of' " either the PUC rule at issue (Tariff Rule 21)[16] *or* any agreements entered into between utilities and third parties seeking to use the utilities' distribution facilities under that rule and " 'to resolve disputes regarding [a utility's] performance of its obligations' " under PUC rules or its agreements with third party electricity generators. (*Id.* at p. 624.) *Davis* held that allowing a solar power generator to sue a utility in superior court for its acts relating to the generator's applications for interconnection under the tariff rule allegedly in violation of the rule met the *Covalt* test, and specifically the interference prong of the test, relying in part on the PUC's reservation of initial jurisdiction over disputes relating to the rule.

In short, PG&E has not shown that PegaStaff's superior court action would interfere with the PUC's ability to employ the limited dispute resolution mechanism prescribed in GO 156 because that mechanism simply does not encompass the instant dispute.

We conclude that section 1759 does not bar a superior court action on PegaStaff's causes of action against PG&E.[17]

## II.

### *Section 1759 Does Not Bar PegaStaff's Suit Against CoreStaff and Agile1.*

PegaStaff's causes of action against CoreStaff and Agile 1 arise from the same material factual allegations that support its causes of action against PG&E. CoreStaff and Agile 1 make no arguments beyond those made by PG&E concerning why section 1759

---

[16] Tariff Rule 21 governs interconnection of solar energy generating systems and utilities' electricity distribution systems. (*Davis*, *supra*, 236 Cal.App.4th at p. 624.)

[17] Nothing in this opinion should be understood as permitting PegaStaff to challenge either Article 5 or GO 156 in the superior court action. Whether the complaint should be amended to reflect this limitation is a matter we leave to the superior court on remand.

27

should bar PegaStaff's suit as to them.  Like PG&E, Agile 1 argues that PegaStaff's claims against it "are inexorably tied to PegaStaff's constitutional challenge" to Article 5 and GO 156.  Likewise, CoreStaff argues:  "PegaStaff's claims, as framed by the FAC, make it a certainty that they would interfere with the [PUC's] orders and policies.  After all, PegaStaff seeks a ruling that [Article 5] and GO 156 are unconstitutional and, consequently, are unenforceable."  Neither CoreStaff nor Agile 1 argues that even if section 1759 does not bar PegaStaff's suit against PG&E, it could nevertheless bar its suit against them.

We have applied the *Covalt* test to the material factual allegations made in this case and determined that section 1759 does not deprive the superior court of subject matter jurisdiction.  Accordingly, we need not decide whether there can be any exception to *Hartwell*'s holding that section 1759 does not bar a suit against parties not regulated by the PUC.  (See *Hartwell*, *supra*, 27 Cal.4th at p. 281 [the rationale of *Covalt* "applies only to bar superior court jurisdiction over . . . cases against regulated utilities"].)

## DISPOSITION

The judgment of the trial court is reversed.  The matter is remanded for further proceedings in conformance with this decision.  PegaStaff shall recover its costs on appeal.

_____

          STEWART, J.

We concur.

_____

KLINE, P.J.

_____

RICHMAN, J.

*PegaStaff, a Division of PegaSoft Corp. v. Pacific Gas & Electric Co.* (A142736)

| | |
|---|---|
| Trial Court: | San Francisco City and County Superior Court |
| Trial Judge: | Hon. Richard J. Kramer |
| Attorney for Plaintiffs and Appellants: | Litigation Law Group<br>Gordon M. Fauth, Jr.<br><br>The Quinlan Law Firm<br>William J. Quinlan<br>Lisa H. Quinlan<br>Sarah M. Steele |
| Attorneys for Defendants and Respondents: | Lafayette & Kumagai<br>Gary T. Lafayette<br>Africa E. Davidson<br><br>Kenneth P. Roberts Law Office<br>Kenneth P. Roberts<br>Ryan P. Tish |
| Attorneys for Real Party in Interest: | Miller Law Group<br>Walter M. Stella<br>Joseph P. Mascovich<br>Noah A. Levin |