Filed 10/13/25  Lenior v. Pacific Gas and Electric Co. CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Calaveras)

----

| | |
|---|---|
| RYAN LENIOR et al., | C101263 |
| Plaintiffs and Appellants, | (Super. Ct. No. 22CV46442) |
| v. | ORDER MODIFYING OPINION AND DENYING REHEARING |
| PACIFIC GAS AND ELECTRIC COMPANY, | |
| Defendant and Respondent. | [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the nonpublished opinion filed herein on September 24, 2025, be modified as follows:

1. On page 14, in the last full sentence on that page, beginning "The PUC thus," after the word "claim" on the second to last line on the page, add as footnote 5 the following footnote, which will require renumbering of all subsequent footnotes:

   **5**     This would include the Leniors' complaint that PG&E failed to follow its own rules when it terminated their service, and their complaint that PG&E got it wrong when it determined they tampered with the meter or are otherwise guilty of unauthorized use.

2. On page 16, in what was footnote 5 but is now footnote 6, add the following sentence to the end of the footnote:

1

Similarly, any constitutional challenge to Rule 11's provision allowing PG&E to terminate service "without notice" for unauthorized use should also "first be directed to the [PUC], not the trial courts."  (*Waters*, *supra*, 12 Cal.3d at p. 7.)

3.  On page 20, the first paragraph under the heading "The Slander and IIED Causes of Action," beginning with "As noted, the trial court" and ending with "causes of action" is deleted and the following paragraph is inserted in its place:

As noted, the trial court sustained the demurrer to the slander and IIED causes of action without leave to amend, but not because it found the PUC has exclusive jurisdiction over those claims.  Instead, it found (1) the slander claim was subject to demurrer because the Leniors failed to allege publication, and (2) the IIED claim was subject to demurrer because they failed to adequately allege extreme and outrageous conduct and severe emotional distress.  In their opening brief, the Leniors mention the slander and IIED causes of action in passing in the "statement of facts" section and the section describing "the second amended complaint," but they do not address either claim in the "argument" section.  Instead, the argument section deals *solely* with the exclusive jurisdiction issue but, as noted, that was not the reason the trial court sustained the demurrer to the slander and IIED causes of action.  We do not address arguments that may be buried in the statement of facts or that are not set forth in the argument section "under a separate heading or subheading summarizing the point."  (Cal. Rules of Court, rule 8.204(a)(1)(B); see also *Provost v. Regents of University of California* (2011) 201 Cal.App.4th 1289, 1294 ["we do not consider all of the loose and disparate arguments that are not clearly set out in a heading"].)

There is no change in the judgment.

The petition for rehearing is denied.


BY THE COURT:

            /s/
EARL, P. J.

            /s/
MAURO, J.

            /s/
DUARTE, J.

2

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Calaveras)

----

| | |
|---|---|
| RYAN LENIOR et al., | C101263 |
| Plaintiffs and Appellants, | (Super. Ct. No. 22CV46442) |
| v. | |
| PACIFIC GAS AND ELECTRIC COMPANY, | |
| Defendant and Respondent. | |

Plaintiffs Ryan and Tamsen Lenior sued defendant Pacific Gas and Electric Company (PG&E) for wrongfully terminating their electrical service, slander, and intentional infliction of emotional distress.  PG&E demurred, arguing (1) California's Public Utilities Commission (PUC) had exclusive jurisdiction over the matters alleged in the complaint and the superior court thus lacked jurisdiction, and (2) all three claims failed to state facts sufficient to constitute a cause of action.  After giving the Leniors two chances to amend their complaint, the trial court ultimately sustained the demurrer

1

without leave to amend and dismissed the complaint. The Leniors appeal, and we affirm. In particular, we agree with the trial court's finding that the PUC has exclusive jurisdiction over the wrongful termination claim, and we find the Leniors forfeited their arguments regarding the other two claims by failing to properly raise them in their opening brief.

## FACTUAL AND PROCEDURAL BACKGROUND

Because we are reviewing an order sustaining a demurrer, we accept as true the factual allegations in the operative complaint. (*City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 865.)

The Leniors own a home that they have lived in since 2017. They receive electric service from PG&E. They have paid all of their monthly PG&E bills except the $126,691.66 bill that is the subject of this lawsuit. As alleged in the complaint, the circumstances of that bill are as follows:

On July 29, 2022, PG&E agents showed up at the Leniors' home, told them their power was being turned off, and removed their meter. The agents accused the Leniors of "illegally growing marijuana," "stealing electricity," and "tampering with" or "soldering something" to the meter, and were "rude, threatening, disrespectful and obnoxious." Their 12-year-old son was present and heard what the PG&E agents said. The Leniors denied the accusations. The agents gave the Leniors a bill for $1,548.56,[1] "which had to be paid at Walmart because the PG&E office was closed because of COVID," and "PG&E did not restore the power until August 2, 2022." The Leniors were thus without power for four to five days.

---

[1] This bill, which was attached to the complaint, stated, "unauthorized electric use," and in the "description" section it stated, "electric internal labor" and "investigative costs—electric (rev)."

On or about August 1, 2022, PG&E sent the Leniors a letter that stated the following: "On 7/29/22, we discovered unauthorized use" at your account, and "[t]his condition prevented the proper registration of being consumed." We presume PG&E meant it discovered a condition that prevented the meter from properly registering the amount of electricity being consumed. The letter went on, "In accordance with PG&E Electric/Gas Rule 17.2 (copy enclosed) . . . , when this type of condition is discovered, PG&E reviews the account and determines the date the unauthorized use started and amount of undercharge. PG&E will then issue to the customer an adjusted bill reflecting the corrected charge, less any payments received." We will discuss PG&E Electric Rule No. 17.2 (Rule 17.2) in more detail below, but for now we note it defines "unauthorized use" as including "[u]nmetered use of electricity resulting from . . . alterations or modifications to . . . electric meters" and "[u]sing PG&E service without compensation." The letter concluded, "If you have any questions or additional information that would be pertinent to establish the amount and value of unauthorized use, please call me. . . . [¶] If I do not hear from you by 8/15/22, I will proceed with the bill preparation using the available information." The Leniors alleged they did not receive this letter until after the August 15, 2022, deadline to respond.

On or about September 29, 2022, the Leniors received a bill from PG&E for $126,691.66, which included revised monthly bills for the period from August 2019 to July 2022. To give one example of how much the bills were revised, in June 2021, the Leniors were billed (and they paid) $244.67, and the revised bill for this same time period was $5,101.85. The back of the bill stated, "If you believe there is an error on your bill, please call . . . to speak with a representative. If you are not satisfied with our response, contact the California Public Utilities Commission (CPUC), Consumer Affairs Branch (CAB)."

When they received the bill, the Leniors contacted an attorney. The attorney sent a letter to PG&E stating the Leniors had never altered their meter; their monthly bills after

3

PG&E replaced the old meter have been around $250, which is far below the amount of the revised bills; and PG&E's investigator "has lost his mind."

PG&E responded in writing a week later, as follows: "PG&E learned that there might be unauthorized use of electricity at the Leniors' home, and so reviewed the meter there on the morning of July 29th. In investigating, the team's weatherhead-reading showed consumption of ~1 kw/hr, while the meter registered .173 kw/hr (i.e., 173 watts). The team onsite also noticed a running, window-mounted air conditioner, which typically registers far above 173 watts per hour. Based on this difference in readings, our team examined the meter and electric panel. That review demonstrated meter-tampering and a review of the Leniors' billing reflects a dramatic drop in usage between the home's 12/13/2018 and 1/14/2019 electric bill segments, as shown below." A table was included in the response.[2] It shows the Leniors' December 2018 PG&E bill was approximately $1,700, and their January 2019 bill was only approximately $150. It also shows that from January to December 2018, the Leniors' bills averaged around $1,500 a month, and from January to September 2019, their bills averaged around $120 a month.

PG&E's response continued, "Our team discussed with Mrs. Lenior that PG&E typically sees this kind of usage with indoor marijuana cultivations. She acknowledged that her husband may at one time have engaged in such activities, but claimed that there was no longer enough money in that business. They called Mr. Lenior who denied tampering with the meter and agreed to come home and discuss the matter. When Mr. Lenior arrived home, our team explained their findings." The letter also stated the $126,691.66 bill was based on Rule 17.2 "regarding backbilling for unauthorized electric use. . . . In the Leniors' case, we have identified considerable evidence of meter-

---

[2]    The table is difficult to read because the type is so small. A copy of the table appears to be attached to the opening brief as exhibit No. A, but that exhibit is not clearly identified or authenticated.

tampering and electric theft during the period from December 16, 2018 through the investigation on July 29, 2022, and so the billing your clients received reflects the actual usage recorded at the home, not the $200-$250/month that you mention as their standard billing." The letter concluded, "If you think there are other intervening facts, I'd of course like to know them. And I will ask [PG&E] to re-run the costs associated with the backbill to ensure that it is correct . . . but based on what I've reviewed, this does not appear to be in error." A few days later PG&E informed the Leniors' attorney the PUC had a complaint process they could utilize.

Rather than filing a complaint with the PUC, the Leniors filed a lawsuit against PG&E. The relevant pleading is the second amended complaint. It contained three causes of action: (1) wrongful investigation; (2) slander; and (3) intentional infliction of emotional distress (IIED). In support of the wrongful investigation claim,[3] the Leniors asserted they did nothing wrong (i.e., they did not tamper with the meter or otherwise receive electricity for which they did not pay), there was no evidence to support the revised bill, and the drop in use was explained by the fact that (1) Tamsen Lenior's parents previously stayed at their property in a large motor home that was hooked up to the power, and (2) they used electric heaters in their home until a wood stove was installed. They asserted PG&E thus had no cause to terminate their power without notice, and that it violated its own rules regarding investigating and billing for unauthorized use. The slander claim was based on the allegation that PG&E's agents falsely stated in the presence of the Leniors' son that they were thieves, were illegally growing marijuana, and were stealing energy, and these statements have caused them

---

[3] In the complaint and the first amended complaint, this claim was called wrongful termination of utility service, while in the second amended complaint it was called wrongful investigation. We find the change in name to be a distinction without a difference.

damages.  Finally, their IIED claim was based on the allegation that these statements were outrageous and caused them severe emotional distress.

PG&E demurred to the entire complaint on the ground that the PUC has exclusive jurisdiction over all three causes of action, and the superior court thus lacked jurisdiction. It also argued all three causes of action failed to state facts sufficient to constitute a cause of action, and, as to the slander claim in particular, it argued the statements at issue were made in an "official proceeding authorized by law" and were thus privileged pursuant to Civil Code section 47.

The trial court sustained the demurrer.  It found the PUC had exclusive jurisdiction over the Leniors' claim that PG&E wrongfully terminated their electricity and billed them for unauthorized use.  It also found the PUC "clearly" did not have exclusive jurisdiction over the slander and IIED claims, but that they both failed to state facts sufficient to constitute a cause of action.  As to the slander claim, the trial court found PG&E's claim of privilege could not be decided on demurrer, but it also found the Leniors did not adequately allege publication.  And as to the IIED claim, the trial court found the Leniors did not adequately allege severe emotional distress.

The trial court twice granted the Leniors leave to amend all three claims, and the amendments spurred two more rounds of demurrers raising the same arguments as the original demurrer.  The trial court ultimately sustained the demurrer to the second amended complaint without leave to amend, finding the Leniors had not cured the problems it had previously identified and "considered three attempts to provide a viable pleading sufficient to meet the interests of justice."  Judgment was entered dismissing the case, and the Leniors filed a timely notice of appeal.

## DISCUSSION

### 1. Standard of Review

"The standard governing our review of an order sustaining a demurrer is well established.  We review the order de novo, 'exercising our independent judgment about

6

whether the complaint states a cause of action as a matter of law. [Citations.]' [Citation.] ' " 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff." [Citations.]' " (*Lefebvre v. Southern California Edison* (2016) 244 Cal.App.4th 143, 151.) "A challenge to the subject matter jurisdiction of a court is properly brought by demurrer to the complaint." (*Greener v. Workers' Comp. Appeals Bd.* (1993) 6 Cal.4th 1028, 1036; see also Code Civ. Proc., § 430.10, subd. (a) [a party may demurrer to a complaint on the ground "[t]he court has no jurisdiction of the subject of the cause of action alleged in the pleading"].) Indeed, subject matter jurisdiction "ordinarily is addressed as a threshold matter, as its absence deprives the court of authority to adjudicate the merits of the dispute." (*Lefebvre*, at p. 152.)

## 2.     The Claim for Wrongful Termination of Utility Service

The trial court sustained PG&E's demurer to the claim for wrongful termination of utility service on the ground the PUC has exclusive jurisdiction over that claim. We agree. Despite renaming this claim "wrongful investigation" (see *ante*, p. 5, fn. 4), at its core this claim is really an objection to PG&E's determination of unauthorized use, overbilling, and termination of service without notice. For example, in their second amended complaint the Leniors' contended, "there is no basis for charging Plaintiffs' $126,681.66 or terminating their service," and "there was no evidence of an unauthorized

7

use which would justify terminating service without notice." Call it what they may, the claim is for wrongful termination of utility service.

### A. The PUC's exclusive jurisdiction over public utilities

Analyzing the wrongful termination claim requires us to reconcile two provisions of the Public Utilities Code:[4] (1) section 1759, which "deprive[s] the superior courts of jurisdiction to 'review, reverse, correct, or annul' any order or decision of the [PUC] or to interfere with the [PUC's] performance of its official duties"; and (2) section 2106, which "vest[s] superior courts with jurisdiction to award damages against any public utility which acts unlawfully, or fails to act as required by law." (*Waters v. Pacific Tel. Co.* (1974) 12 Cal.3d 1, 3-4 (*Waters*).) Both sections are part of the Public Utilities Act (§ 201 et seq.) (the Act).

Section 1759 is in article 3 of chapter 9 of the Act, which governs judicial review of PUC action. Section 1756 provides judicial review of PUC action may be obtained by filing a petition for writ of review directly in the Court of Appeal or the Supreme Court. And section 1759, subdivision (a) provides, "No court of this state, except the Supreme Court and the court of appeal, to the extent specified in this article, shall have jurisdiction to review, reverse, correct, or annul any order or decision of the commission or to suspend or delay the execution or operation thereof, or to enjoin, restrain, or interfere with the [PUC] in the performance of its official duties . . . ." As our Supreme Court has explained, "Having thus vested [the Court of Appeal and the Supreme Court] with . . . jurisdiction to review [PUC] actions [in section 1756], the Legislature then made it clear in section 1759 . . . that no other court has jurisdiction either to review or suspend the [PUC's] decisions or to enjoin or otherwise 'interfere' with the [PUC's] performance of

---

[4]     Undesignated statutory references are to the Public Utilities Code.

its duties."  (*San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 916 (*Covalt*).)

Section 2106 is in chapter 11, which governs violations of the Act.  It provides, "Any public utility which does, causes to be done, or permits any act, matter, or thing prohibited or declared unlawful, or which omits to do any act, matter, or thing required to be done, either by the Constitution, any law of this State, or any order or decision of the [PUC], shall be liable to persons . . . affected thereby for all loss, damages, or injury caused thereby or resulting therefrom," and "[a]n action to recover for such loss, damage, or injury may be brought in any court of competent jurisdiction."  On its face, section 2106 thus authorizes "the traditional private remedy of an action for damages brought by the injured party in superior or municipal court against any public utility that does any act prohibited—or omits to do any act required—'by the Constitution, any law of this State, or any order or decision of the [PUC].' "  (*Covalt, supra*, 13 Cal.4th at p. 916.)

In a series of cases stretching back to the 1970s, our Supreme Court has held that section 2106's authorization of an action for damages against a public utility " 'must be construed as limited to those situations in which an award of damages would not hinder or frustrate the [PUC's] declared supervisory and regulatory policies.' [Citation.] Preemption under section 1759 is not limited to actions that 'would directly contravene a specific order or decision of the [PUC].' [Citation.]  An action is also barred if it 'would simply have the effect of undermining a general supervisory or regulatory policy of the [PUC], i.e., when it would "hinder" or "frustrate" or "interfere with" or "obstruct" that policy.' "  (*Gantner v. PG&E Corp.* (2023) 15 Cal.5th 396, 405; see also *Waters, supra*, 12 Cal.3d at pp. 3, 10 [holding § 1759 barred action for damages against telephone company for allegedly failing to provide adequate telephone service]; *Covalt, supra*, 13 Cal.4th at pp. 902-903 [holding § 1759 barred action against utility for damages allegedly caused by electric and magnetic fields arising from utility's powerlines].)

9

The Supreme Court has developed a three-part test to determine whether section 1759 bars or preempts an action for damages—often referred to as the *Covalt* test, after the case in which it was first established. (*Covalt, supra*, 13 Cal.4th 893.) Pursuant to the *Covalt* test, "[s]ection 1759 bars an action when three requirements are met: (1) the PUC had the authority to adopt certain regulations or policies; (2) the PUC actually exercised that authority; and (3) the action would interfere with the PUC's exercise of that authority." (*Gantner v. PG& E Corp., supra*, 15 Cal.5th at p. 405.) When these three requirements are met, the PUC has "exclusive jurisdiction" over the matter, and superior courts, conversely, lack jurisdiction. (See *Davis v. Southern California Edison Co.* (2015) 236 Cal.App.4th 619, 637 [" ' "[t]he PUC has exclusive jurisdiction over the regulation and control of utilities, and once it has assumed jurisdiction, it cannot be *hampered*, interfered with, or *second-guessed* by a concurrent superior court action addressing the same issue" ' "]; *Sarale v. Pacific Gas & Electric Co.* (2010) 189 Cal.App.4th 225, 231 [certain issues "lie within the exclusive jurisdiction of the [PUC] to decide"].) "In short, an award of damages is barred by section 1759 if it would be contrary to a policy adopted by the PUC and would interfere with its regulation of public utilities." (*Hartwell Corp. v. Superior Court* (2002) 27 Cal.4th 256, 275.)

### B.     Application of the Covalt *test*

In order to apply the *Covalt* test, we first identify the "subject matter" of the claim, and we determine whether the PUC is authorized to regulate that subject matter. (*PegaStaff v. Pacific Gas & Electric Co.* (2015) 239 Cal.App.4th 1303, 1322 (*PegaStaff*).) If the answer is yes, "we next consider whether the PUC has exercised that authority. If it has, the final question is whether [the Leniors'] superior court action against PG&E will interfere with or frustrate the PUC's exercise of regulatory authority." (*Ibid*.)

Here, the Leniors allege PG&E wrongfully terminated their service and wrongfully billed them for unauthorized use of electricity. We find the PUC is authorized

10

to regulate that subject matter and has exercised its authority, and the first two prongs of the *Covalt* test are thus met.

The PUC " 'is a state agency of constitutional origin with far-reaching duties, functions and powers. (Cal. Const., art. XII, § 1-6.) The Constitution confers broad authority on the [PUC] to regulate utilities, including the power to fix rates, establish rules, hold various types of hearings, award reparation, and establish its own procedures. (*Id*., § 2, 4, 6.) The [PUC's] powers, however, are not restricted to those expressly mentioned in the Constitution: "The Legislature has plenary power . . . to confer additional authority and jurisdiction upon the [PUC] . . . ." (Cal. Const., art. XII, § 5.)' [Citation.] [¶] Pursuant to this constitutional provision the Legislature enacted, inter alia, the Public Utilities Act. (§ 201 et seq.) That law vests the [PUC] with broad authority to "supervise and regulate every public utility in the State" (§ 701) and grants the [PUC] numerous specific powers for the purpose. Again, however, the [PUC's] powers are not limited to those expressly conferred on it: the Legislature further authorized the [PUC] to 'do all things, whether specifically designated in [the Public Utilities Act] or in addition thereto, which are necessary and convenient' in the exercise of its jurisdiction over public utilities. [Citation.] Accordingly, 'The [PUC's] authority has been liberally construed' [citation], and includes not only administrative but also legislative and judicial powers." (*Covalt, supra*, 13 Cal.4th at pp. 914-915, italics omitted.) The PUC's authority to regulate utilities is certainly broad enough to include regulating unauthorized use, termination of services, and billing disputes.

The PUC has exercised this authority, in part, by requiring utilities to adopt rules regarding unauthorized use and to "develop procedures designed to more effectively detect, investigate and deter unauthorized use of energy." (*Re: Retroactive Billing by Gas and Electric Utilities to Correct Alleged Meter Underbillings Due to Meter Error and Meter Fraud* (1986) 21 Cal.P.U.C.2d 270 [1986 Cal.P.U.C. Lexis 888, p. *11].) In explaining the reasons for imposing these requirements, the PUC noted utilities have a

11

"statutory obligation not to discriminate unreasonably among its customers. Customers of the same class should pay equal amounts for equal amounts of energy consumed, and the utility should take steps to recover payment for unmetered energy that is consumed by a customer. The cost of unmetered energy is borne by all other ratepayers and should be minimized or eliminated." (*Id.*, 1986 Cal.P.U.C. Lexis at p. *2) We have little trouble concluding the PUC had the authority to impose such a requirement on utilities.

Public utilities are required to file with the PUC "all rules . . . which in any manner affect or relate to . . . service." (§ 489, subd. (a).) These rules are often referred to as tariffs, and, "[s]uch a tariff, when approved by the PUC, has the force of law." (*Pacific Bell v. Public Utilities Com.* (2000) 79 Cal.App.4th 269, 274.) When the PUC approves a tariff, "it 'acts pursuant to its exclusive jurisdiction and constitutional authority.' " (*Hillsboro Properties v. Public Utilities Com.* (2003) 108 Cal.App.4th 246, 258.) "A condition imposed by a tariff binds a utility's customers without regard to whether a contract is signed by the customer and without regard to the customer's actual knowledge of the tariff." (*Los Angeles Cellular Telephone Co. v. Superior Court* (1998) 65 Cal.App.4th 1013, 1018, fn. 6.)

Here, PG&E has adopted, and the PUC has approved, rules (or tariffs) regarding unauthorized use, termination of services for unauthorized use, and billing disputes, all of which appear relevant to this case.

Rule 17.2 governs unauthorized use. As defined by Rule 17.2, unauthorized use includes, but is not limited to, "[u]nmetered use of electricity resulting from unauthorized connections, alterations or modifications to electric supply lines and/or electric meters," and "[u]sing PG&E service without compensation to PG&E," which is what PG&E claims happened here. (Rule 17.2.A.1. & 17.2.A.6.) The rule provides, "Where unauthorized use is suspected by PG&E, PG&E shall promptly conduct an investigation. [¶] Whenever possible, PG&E shall collect and preserve evidence in the matter, test the meter and obtain connected load information from the Customer . . . . [¶] If the meter

12

cannot be tested or connected load data cannot be obtained, PG&E will document the reasons why such information could not be obtained. [¶] Whenever possible, upon completion of PG&E's investigation, the Customer . . . will be advised of PG&E's claim and shall be given an opportunity to respond to the claim." (Rule 17.2.B.) It also provides, "Where PG&E determines there has been unauthorized use, PG&E shall have the legal right to recover, from the person who benefited from such unauthorized use, the estimated undercharges for the full period of that person's unauthorized use." (Rule 17.2.A.) "If accurate meter readings are available for the unauthorized use period, they will be used for billing purposes," but "[i]if accurate meter readings are not available or the electric usage has not been accurately measured, PG&E may estimate the energy usage for billing purposes. The basis for the estimate may include, without limitation and for illustrative purposes only, the physical condition of the metering equipment, available meter readings, records of historical use, or the general characteristics of the load and operation of the Customer or person being billed." (Rule 17.2.C.2.) Finally, the rule provides, "where PG&E determines unauthorized use is occurring, PG&E may . . . discontinue service without further notice." (Rule 17.2.F.)

PG&E Electric Rule No. 11 (Rule 11) governs termination of service. It provides, "If PG&E terminates . . . service to a customer . . . for any of the reasons or upon any of the grounds stated herein, PG&E shall incur no liability whatsoever to said customer." It also provides, "PG&E may terminate service without notice for unauthorized use of service as defined in Rule 17.2." (Rule 11.J.)

Finally, PG&E Electric Rule No. 10 (Rule 10) governs billing disputes. It provides that if a customer disputes a bill, it should file a complaint with PG&E. (Rule 10.A & 10.B.) If the customer is not satisfied with PG&E's response to the complaint, it "shall submit [to the PUC] the disputed bill and a statement setting forth the basis for the dispute of the amount billed." (Rule 10.B.2.c.) The PUC will then "review the basis of the billed amount, and advise both parties of its findings." (Rule 10.B.2.d.) Pursuant to

13

Rule 10, the Leniors thus could have filed a complaint with the PUC disputing the $126,691.66 bill for unauthorized use.

We also find it relevant that the PUC is authorized to adjudicate customer complaints, including (1) complaints alleging a utility violated the law, a PUC rule or order, or its own tariffs, and (2) complaints challenging the accuracy of a bill. (See §§ 1701, subd. (a) ["All hearings, investigations, and proceedings shall be governed by this part"], 1701.1, subds. (a) & (d)(2) ["proceeding[s]" include "adjudication," and "[a]djudication cases" include "complaints"], 1701.2 [outlining procedures for adjudication cases], 1702 ["Complaint may be made by . . . any . . . person . . . setting forth any act or thing done or omitted to be done by a public utility . . . in violation or claimed to be in violation, of any provision of law or of any order or rule of the commission"]; Cal. Code Regs., tit. 20, § 1.3, subd. (a) [" 'Adjudicatory proceedings' are . . . complaints against regulated entities, including those complaints that challenge the accuracy of a bill"].) The PUC has adopted detailed regulations regarding the adjudication of complaints, and these regulations include provisions for (among other things) discovery, law and motion, challenges to the assigned administrative law judge, an evidentiary hearing, and a written decision. (See Cal. Code Regs., tit. 20, §§ 4.1-4.6 [complaints and answers], 7.1-7.6 [scoping procedures and prehearing conferences], 9.1-9.8 [challenging assigned administrative law judge and commissioner], 10.1-10.4 [discovery], 11.1-11.7 [law and motion], 12.1-12.7 [settlement], 13.1-13.15 [hearings, evidence, briefs, and submission], 14.1-14.7 [recommended decisions by presiding officer], 15.1-15.6 [PUC decisions], 16.1-16.6 [rehearing].) Moreover, pursuant to section 1756, the complainant may seek judicial review of the PUC's decision by filing a petition for writ of review in the Court of Appeal or the Supreme Court.

The PUC thus has authority to adjudicate complaints like the one the Leniors have asserted in their wrongful termination claim and has adopted procedures governing its adjudication of such complaints. Indeed, we note that complaints about PG&E's

14

termination of services and/or bills for alleged unauthorized or unmetered use are routinely adjudicated by the PUC. (See, e.g., *Dann v. Pacific Gas & Electric Co.* (Aug. 10, 2017) Cal.P.U.C. Dec. No. 17-08-007 [2017 Cal.P.U.C. Lexis 356]; *Mad River Community Hosp. v. Pacific Gas & Electric Co.* (Nov. 2, 2000) Cal.P.U.C. Dec. No. 00-11-011 [2000 Cal.P.U.C. Lexis 739]; *Gonzales v. Pacific Gas & Electric Co.* (1991) 41 Cal.P.U.C. 609 [1991 Cal.P.U.C. Lexis 723]; *Bates v. Pacific Gas & Electric Co.* (1990) 36 Cal.P.U.C.2d 333 [1990 Cal.P.U.C. Lexis 271]; *Folts v. Pacific Gas & Electric Co.* (1989) 32 Cal.P.U.C.2d 477 [1989 Cal.P.U.C. Lexis 446]; *James v. Pacific Gas & Electric Co.* (1986) 21 Cal.P.U.C.2d 269 [1986 Cal.P.U.C. Lexis 399]; *Phillips v. Pacific Gas & Electric Co.* (1984) 15 Cal.P.U.C.2d 146 [1984 Cal.P.U.C. Lexis 368].)

Based on the above, we find the PUC has the authority to regulate unauthorized use in general and terminating service and retrospective billing for unauthorized use in particular. We also find the PUC has the authority to resolve disputes between customers and utilities with respect to these matters. Prong one of the *Covalt* test is thus met. We also find the PUC exercised that authority by requiring utilities to adopt rules regarding unauthorized use, by approving PG&E's Rules 10, 11, and 17.2, and by adopting its own detailed procedures for adjudicating customer complaints involving billing disputes and allegations a utility failed to follow its own rules. Prong two of the *Covalt* test is thus met.

The question then becomes whether allowing the Leniors to proceed in the superior court with their wrongful termination claim would hinder or interfere with the PUC's exercise of its authority. We determine it would. As noted above, PG&E has adopted, and the PUC has approved, Rule 11, which provides, "If PG&E terminates . . . service to a customer . . . for any of the reasons or upon any of the grounds stated herein, PG&E shall incur no liability whatsoever to said customer." Rule 11 also provides PG&E "may terminate service without notice for unauthorized use of service as defined in Rule 17.2," and Rule 17.2 defines "unauthorized use" of service as including

15

"[u]nmetered use of electricity resulting from unauthorized connections, alterations or modifications to electric supply and/or electric meters." (Rules 11.J & 17.2.A.1.) Here, the Leniors seek damages for PG&E's termination of their utility service for unauthorized use. Allowing the Leniors to proceed with such an action would effectively nullify Rule 11's "no liability" provision and would thus "interfere with the [PUC] in the performance of its official duties." (§ 1759.) Put another way, allowing a damages claim to proceed in superior court would be inconsistent with the PUC's approval of Rule 11, which provides PG&E shall incur "no liability whatsoever" for terminating service. (See *Covalt, supra*, 13 Cal.4th at p. 939 [award of damages based on the plaintiffs' fear that electric and magnetic fields arising from powerlines would cause them physical harm "would be inconsistent with the [PUC's] conclusion . . . that the available evidence does not support a reasonable belief that [such] fields present a substantial risk of physical harm" (italics omitted)].)

We note that limitations on a public utility's liability have long been upheld by courts.[5] "Limitations on liability are properly included in tariffs as a subject clearly within the PUC's regulatory powers. [Citation.] As our courts have long recognized, it is an equitable trade-off—the power to regulate rates and to set them below the amount an unregulated provider might otherwise charge requires a concomitant limitation on liability." (*Los Angeles Cellular Telephone Co. v. Superior Court, supra*, 65 Cal.App.4th at pp. 1017-1018; see also *Colich & Sons v. Pacific Bell* (1988) 198 Cal.App.3d 1225, 1234 [holding limitation of liability provisions in PUC-approved tariff " 'are binding on

---

[5]  We also note that any challenge to such a limitation "should first be directed to the [PUC], not the trial courts." (*Waters, supra*, 12 Cal.3d at p. 7; see also *PegaStaff, supra*, 236 Cal.App.4th at pp. 388-390 [holding superior courts lack jurisdiction to consider constitutional challenges to PUC orders; instead, plaintiffs seeking to make such a challenge must first seek a remedy from the PUC, and then file a petition for writ of review in the Court of Appeal or the Supreme Court].)

16

the public generally' because they 'are an inherent part of the established rates and have the force and effect of law' "].) *Waters, supra*, 12 Cal.3d 1 is instructive. The plaintiff in that case sued a telephone company for damages for failing to provide her with adequate telephone service, as required by section 451.[6] The telephone company had adopted a tariff schedule (which was approved by the PUC) that limited its liability to a credit allowance in an amount equal to the fixed charges for the period during which the customer's phone was out of service. (*Waters*, at pp. 4-5.) The company sought partial summary judgment on the ground the plaintiff was limited to recovering the credit allowance provided in the tariff schedule. The trial court granted the motion, and when the plaintiff subsequently waived her right to the credit allowance, it entered judgment on nonsuit in favor of the telephone company. (*Id*. at pp. 5-6.) The plaintiff appealed, and our Supreme Court affirmed.

The court began by noting the PUC had broad authority to supervise and regulate public utilities and set rates. (*Waters, supra*, 12 Cal.3d at p. 6.) It then noted, "The subject of limitations upon liability of . . . utilities has long been considered to be a proper subject for [PUC] regulation and supervision." (*Ibid*.) It explained, " 'The theory underlying these decisions is that a public utility, being strictly regulated in all operations with considerable curtailment of its rights and privileges, shall likewise be regulated and limited as to its liabilities. In consideration of its being peculiarly the subject of state control, "its liability is and should be defined and limited." [Citation.] There is nothing harsh or inequitable in upholding such a limitation of liability when it is thus considered that the rates as fixed by the [PUC] are established with the rule of limitation in mind.

---

[6] Section 451 provides, "Every public utility shall furnish and maintain such adequate . . . service . . . as . . . necessary to promote the . . . convenience of its patrons." The plaintiff was a real estate broker, and she claimed the company's failure to provide adequate phone service caused her $750,000 in damages, presumably due to lost business. (*Waters, supra*, 12 Cal.3d at pp. 4-5.)

Reasonable rates are in part dependent upon such a rule.' " (*Id*. at p. 7.) Finally, it concluded, "It stands undisputed that the [PUC] has approved a general policy of limiting the liability of telephone utilities for ordinary negligence to a specified credit allowance, and has relied upon the validity and effect of that policy in exercising its rate-making functions. . . . It also appears clear that to entertain suits such as plaintiff's action herein and authorize a substantial recovery from Pacific would thwart the foregoing policy. That being so, the express language of section 1759 . . . bars plaintiff's action." (*Id*. at p. 10.)

So, too, in this case. It "stands undisputed" that the PUC has approved a rule providing PG&E "shall incur no liability whatsoever" if it terminates service for unauthorized use. (Rule 11 & 11.J.) Allowing the Leniors to maintain a suit for damages against PG&E based on the allegation that it wrongfully terminated their service would "thwart" that rule. We thus conclude that section 1759 bars the Leniors' claim.

None of the Leniors' arguments convinces us the superior court has jurisdiction over their wrongful termination claim. We note the argument section of the Leniors' opening brief is 16 pages long, and 12 of those 16 pages consist *entirely* of a quote from *PegaStaff, supra*, 239 Cal.App.4th 1303, with little to no discussion of *PegaStaff*'s applicability to this case. Simply quoting from a case "without any discussion of [its] application to the present case results in forfeiture. [Citations.] We are not required to examine undeveloped claims or to supply arguments for the litigants." (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52.)

In any event, *PegaStaff* is distinguishable. It involved a claim against PG&E for discriminating against a temporary staffing agency on the basis of sex, race, national origin, or other enumerated characteristics in violation of Civil Code section 51.5 by creating "a tier structure" whereby minority-owned businesses "were placed in the first tier and all other businesses, such as [the plaintiff], were placed in the second tier. First tier businesses received preference in job orders for temporary workers." (*PegaStaff,*

18

*supra*, 239 Cal.App.4th at p. 1311.) PG&E filed a motion for judgment on the pleadings, arguing that, pursuant to section 1759, the superior court lacked jurisdiction over the claim. (*PegaStaff*, at pp. 1313-1314.) The trial court granted the motion, and the appellate court reversed. (*Id*. at p. 1310.) It began its analysis by providing a lengthy summary and description of section 1759, the *Covalt* test, and cases applying the *Covalt* test. (*PegaStaff*, at pp. 1314-1322.) This is the portion of *PegaStaff* that the Leniors quote from in their opening brief. The court then applied the *Covalt* test to the case before it. (*Id*. at p. 1322.) It found the PUC had authority to regulate utilities' minority enterprise diversity programs and it exercised that authority by adopting a general order governing such programs, and the first two prongs of the *Covalt* test were thus met. (*Id*. at pp. 1322-1326.) But it also found allowing the plaintiff's lawsuit to go forward would *not* interfere with or frustrate the PUC's regulatory authority, and the third prong was thus not met. In so finding, the court noted the plaintiff's claims were based on PG&E's implementation of "a tier system, under which minority enterprises were given preference for job orders," but the PUC's general order expressly did not permit a utility to utilize preferences. (*Id*. at p. 1326; see *id*. at pp. 1326-1327.) The court thus concluded, "Superior court action on a claim based on a preferential system will not hinder or obstruct the PUC's exercise of regulatory authority. To the contrary, . . . this suit will enforce, not obstruct, the PUC regulation." (*Id*. at p. 1327.) Factually, *PegaStaff* is nothing like this case, and the Leniors fails to explain how it supports their argument that the superior court has jurisdiction over their wrongful termination claim.

The Leniors also argue the PUC has "waived" its jurisdiction over claims for damages, and the superior court thus has jurisdiction over their wrongful termination claim. They point to a document published by the PUC titled "Formal Complaint Procedures and Alternative Dispute Resolution Program." As relevant here, the document states, "Through the formal complaint procedure, the CPUC can order the utility to take corrective action on a variety of formal complaints, including an adjustment

19

to a customer's bill. . . . It is important to note, however, that the CPUC is not allowed to award damages for such things as personal injury, property damage, emotional distress, or loss of wages or profits. To request compensation for damages, the customer must file a claim in a civil court." Whatever we think of this argument in the abstract, we find it has no application here because the PUC has approved PG&E's Rule 11, which provides PG&E shall have "no liability whatsoever" if it terminates service for unauthorized use. Thus, even if we were to agree that *some* claims requesting compensation for damages from a utility provider could be filed in superior court, the Leniors' claim cannot.

### 3. The Slander and IIED Causes of Action

As noted, the trial court sustained the demurrer to the slander and IIED causes of action without leave to amend, but not because it found the PUC has exclusive jurisdiction over those claims. Instead, it found (1) the slander claim was subject to demurrer because the Leniors failed to allege publication, and (2) the IIED claim was subject to demurrer because they failed to adequately allege extreme and outrageous conduct and severe emotional distress. In their opening brief, the Leniors mention the slander and IIED causes of action in passing, but they do not address either claim in the argument section. Instead, the argument section deals solely with the exclusive jurisdiction issue but, as noted, that was not the reason the trial court sustained the demurrer to the slander and IIED causes of action.

In their reply, the Leniors briefly argue for the first time that they alleged facts sufficient to constitute causes of action for slander and IIED. By failing to raise the issue in their opening brief, they have forfeited it. (See *Aghaian v. Minassian* (2021) 64 Cal.App.5th 603, 620 [appellant "forfeited this argument by failing to explicitly raise it in his opening brief"]; *Cox v. Griffin* (2019) 34 Cal.App.5th 440, 453 [appellant "has forfeited this issue by failing to raise it in her opening brief"]; *Nordstrom Com. Cases* (2010) 186 Cal.App.4th 576, 583 ["points raised for the first time in a reply brief on appeal will not be considered"].)

20

## DISPOSITION

The judgment is affirmed.  The parties shall bear their own costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(5).)

/s/
EARL, P. J.

We concur:

/s/
MAURO, J.

/s/
DUARTE, J.

21